UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARK TEMPLE,

                              Plaintiff

                                                              DECISION AND ORDER

-vs-

                                                              07-CV-6346 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.

_____

APPEARANCES

For the Plaintiff:           William J. McDonald, Jr., Esq.
                             Bond and McDonald, P.C.
                             91 Genesee Street
                             Geneva, New York 14456

For the Defendant:           Terrance P. Flynn, Esq.
                             United States Attorney for the
                             Western District of New York
                             Christopher V. Taffe, Esq.
                             Assistant United States Attorney
                             100 State Street
                             Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner"), which denied

plaintiff's application for disability insurance benefits.  Now before the Court is

defendant's motion for judgment on the pleadings [#4] and plaintiff's cross-motion [#5]

1

for the same relief.  For the reasons stated below, defendant's application is denied,

plaintiff's application is granted, and this matter is remanded for further administrative

proceedings.

PROCEDURAL HISTORY

Plaintiff applied for disability benefits on or about March 24, 2004, claiming to be

disabled due to bi-polar disorder and arthritis of the spine. (55).[1]  On July 13, 2004, the

Commissioner denied the application.  On May 22, 2006, a hearing was held before an

Administrative Law Judge ("ALJ"), and on August 23, 2006, the ALJ issued a written

decision denying Plaintiff's claim.  In that regard, the ALJ determined that Plaintiff was

not disabled at any time prior to December 31, 2002, his "date last insured."  Plaintiff

appealed, however, the Appeals Council declined to review the ALJ's determination. (5-

8).  On July 16, 2007, Plaintiff commenced the instant action.  Defendant filed the

subject motion for judgment on the pleadings on February 13, 2008, and Plaintiff filed

the subject cross-motion on February 14, 2008.  On April 10, 2008, counsel for the

parties appeared before the undersigned for oral argument of the motions.

VOCATIONAL HISTORY

At the time of the hearing, Plaintiff was 45 years of age and had a high school

education.  His employment history includes work as a fork-lift operator, machine

cleaner, and janitor.  Plaintiff held the fork-lift operator's position for twelve years, until

November 1991, when he was fired after having a physical altercation with another

employee. (214).  Since that time, he has held a variety of jobs, usually for periods of

---

[1]Unless otherwise noted, citations are to the administrative record.

less than a year.  It appears that Plaintiff did not work in 1997.  However, the record indicates that Plaintiff also earns money from multiple rental properties.  For example, on October 18, 2003, Plaintiff indicated that his sources of income were "rental income and wife's work." (102).  The same day, Plaintiff indicated that he was having "increased stress with both his family as well as on the side managing of residential property," and that he was having "multiple stresses," with "family as well as with his properties." (99).  And, on October 24, 2003, Plaintiff indicated that he was stressed "from responsibility of being a landlord." (117).

MEDICAL EVIDENCE

Plaintiff's medical records primarily consist of records from his primary care physician, Ramzi N. Ghosn, M.D. ("Ghosn") and his psychiatrist, Kang Yu, M.D. ("Yu").  The record also contains a report from Phillip C. Yorke, Ph.D. ("Yorke"), a non-treating, examining psychologist.  There are also records from a four-day hospital stay in October 2003, when Plaintiff was admitted for psychiatric evaluation after he attacked and threatened his wife.  Additionally, on 2004, Jane Stafford, Ph.D., a non-examining agency review psychologist, indicated that she had "insufficient evidence" to complete a psychiatric review technique form. (174).

On February 15, 2000, Yorke examined Plaintiff, after Plaintiff was referred to him for evaluation by Seneca County Child Protective Services following an incident of domestic violence in February 1998.  Yorke's diagnostic impression was "mood disorder nos, rule out major depression, rule out bipolar disorder." (370)   At that time, Plaintiff "reported mood swings in which he was at times depressed and other times quite angry. He stated, 'You have to convey your anger about a situation.  You need to swear and

3

carry on.  How else can you convey it?" (369).  However, Yorke found "no indications of depression or anxiety on the Rorschach or Thematic Apperception Test." (369).

Shortly after Yorke's examination, Plaintiff began taking Serzone for depression, apparently prescribed by Ghosn.  On April 24, 2000, Ghosn noted "mood improved," "patient is doing well with the Serzone." (138).  On December 12, 2000, Ghosn reported "depression is doing very well" and "depression controlled on Serzone" (136).  On May 14, 2001, Ghosn wrote that Plaintiff was "doing quite well with Serzone." (134).  On April 8, 2002, Ghosn reported that Plaintiff was doing well and did not feel depressed or angry: "He does not feel down, depressed, suicidal, or not able to take interest in normal activities." (132).  On September 13, 2002, Ghosn wrote that Plaintiff was complaining of increased stress and depression, due to the fact that his wife gets upset at him when he smokes marijuana with friends. (128).  On September 26, 2002, Ghosn indicated that Plaintiff's depression was "much better" with the drug Effexor. (127). Following this note, there is a gap of approximately one year, until October 2003, during which Plaintiff apparently did not receive treatment for his alleged psychological disability.

On October 18, 2003, Plaintiff was admitted to the hospital, with the chief complaint being "suicidal, threatening to harms others, broke up house last night." (101).  Plaintiff's symptoms were described as "bipolar- pressured speech - racing thoughts- angry - irritable - threatening. (*Id.*).  Psycho-social stressors were described as "finances, marital conflict, untreated bipolar disorder." (*Id.*).  Plaintiff's activities of daily living ("ADLs") were noted as being "adequate." (*Id.*).  Plaintiff reported using marijuana daily since age 16. (102).  He appeared "confused" with "racing mixed-up

4

thoughts," and expressed hostility and anger towards his wife and family. (103).

Plaintiff reported having "moderate" problems with sleep, and indicated that he "stays

up all night cruising the internet." (104).  The doctor reported, "Broke up house, wanted

to kill people.  Out of control, refuses to take meds [says] they don't help. [Patient]

manic with psychotic features." (108).  The diagnosis was bipolar disorder mixed, with

psychotic features. (109).  Following Plaintiff's admission, he was examined by Ellis

Levy, M.D. ("Levy"), who reported: "He has had increased stress with both his family as

well as on the side managing of residential property.  He has had increase in stress and

doesn't feel that his wife has been helping him out much and hasn't been helping him

with the family.  He is a stay at home dad and has had multiple stresses, again, both

family as well as with his properties." (99).  Levy further wrote: "The patient stated that

he was homicidal and suicidal at the time [he was brought in], although he denies that

now.  He stated that he was going to kill everybody, due to the overall stresses that he

has been susceptible to *over the last weeks to months*." (99) (emphasis added).  Levy's

impression was: "A 43 year old male, now admitted for increased overall stress with

recent history of homicidal and suicidal thoughts, not presently active.  Will continue

with psychiatric treatment." (100).  Plaintiff was discharged on October 22, 2003, at

which time David Tiller, M.D. ("Tiller") summarized Plaintiff's history, noting, "He has

been noncompliant with medications.  Since going off medications, he has developed

irritiability, threatening behavior." (97).  Tiller indicated that while in the hospital, Plaintiff

was given Zyprexa, Depakote, and Zoloft. (97).

On November 17, 2003, Yu began treating Plaintiff.  At the outset, Yu noted that

Plaintiff "apparently" had severe bipolar disorder, and was doing well on his

medications. (112).  Following a full psychological evaluation, Yu found that Plaintiff's

condition "does not meet bi-polar I disorder or bi-polar II disorder, but he has mood

fluctuations which alternate between depression and mixed stated irritiability and

anger." (112).  Yu indicated that Plaintiff's Global Assessment Functioning ("GAF")

score was 58, and that he was responding well to treatment. (115).  Yu's diagnosis was

bi-polar disorder nos. (*Id.*).[2]

On January 20, 2004, Yu noted that Plaintiff's mood was stable, with minimal

irritability, broad affect, and pleasant mood. (111).  On March 16, 2006, Yu indicated

that Plaintiff's mood fluctuations were under control with medication. (111).  Plaintiff told

Yu that he was sleeping during the day, because he was not sleeping well at night due

to back pain. (*Id.*).  Plaintiff also indicated that he was "babysitting" his children and

driving them where they needed to go, while his wife worked. (*Id.*).  On March 23, 2004,

Kenneth Mathis, R.P.A., stated that Plaintiff's depression was stable. (119).

On April 22, 2004, Yu completed an assessment describing Plaintiff's symptoms

as mood swings, poor motivation, low energy/fatigue, and fleeting suicidal ideation. Yu

stated that Plaintiff's mood showed increased stability on medications, and that he had

a pleasant affect, though he has easily agitated.  Yu stated that Plaintiff had a limited

ability to sustain concentration, and had limited social interaction, because of history of

---

[2]"Bipolar disorder is a serious mental illness marked by mood shifts and episodes of depression
and mania. The Diagnostic and Statistical Manual of Mental Disorders lists four separate categories of
bipolar disorder: bipolar I, bipolar II, cyclothymia, and bipolar not-otherwise-specified (NOS).  Bipolar I is
marked by manic episodes followed by periods of depression that may not be severe. In contrast, Bipolar
II is marked by major depressive episodes and hypomanic periods, or milder episodes of mania.
Cyclothymia is defined as episodes of hypomania and depressive periods that do not reach major
depressive proportions. Bipolar NOS means that the bipolar state does not fit into the other categories."
Penn State University, Milton S. Hershey Medical Center College of Medicine Website,
http://www.hmc.psu.edu/healthinfo/b/bipolar.htm (April 11, 2008).

difficulty with co-workers, but also stated that Plaintiff had no limit to his ability to adapt to changes in the work setting. (166-172).

On June 10, 2004, Yu reported that Plaintiff's mental status was quite stable with medication, with no angry outbursts or mood fluctuations.  However, Plaintiff reported "feeling bored with life." (180).  On July 20, 2004, Plaintiff reportedly told Lisa D. Lucas, MA, NCC ("Lucas"), that he felt "very depressed" at home, and that he felt better when doing things outside the house. (179).  On September 9, 2004, Yu recorded that Plaintiff was still having no mood fluctuations or angry outbursts, but was feeling lethargic and was sleeping during the day. (175).  Yu indicated that Plaintiff was in the depressive phase of bipolar. (*Id.*).  Plaintiff told Yu that he was planning to find a job, but did not think that he would, since he would need to start work after 9 am, because he was responsible for putting his children on the school bus. (*Id.*).  On November 4, 2004, Yu wrote: "At this time, his bi-polar depression may not be under complete remission.  Symbyax will be increased to 12/50, and by increasing prozac part of the capsule, he may come out of the depression completely." (202).  Yu stated that Plaintiff's anger was under good control, with broad affect and pleasant mood, but that he was having excessive sleepiness. (*Id.*).

On December 21, 2004, Yu completed another assessment, in which he stated that Plaintiff had "poor-to-no ability" in the following areas: following work rules, relating to co-workers, dealing with the public, using judgment, interacting with supervisors, dealing with work stress, functioning independently, maintaining attention and concentration, and understanding and remembering complex job instructions. (187-88).  Yu further stated that Plaintiff had fair ability in the following areas: understanding and

7

carrying out simple job instructions, as well as detailed but not complex job instructions.

(*Id.*).  Yu also stated, however, that "overall ability to adjust to job is fair to poor at this

time attributable to instability of mood," and that Plaintiff has difficulty in social settings

and poor ability to relate predictably in social situations and in demonstrating reliability.

(*Id.*).

> On January 31, 2005, Yu reported that Plaintiff
>
> is afraid to go out to look for a job.  It is partially because his depression is
> not under complete remission and partially, he is afraid to face any kind of
> work situation due to his past experiences which were very unpleasant
> when he had jobs.  He applied for Social Security Disability benefit, and
> he seems to be so low in his ambition, he may be better off receiving
> Social Security Disability.  Once his Social Security Disability Benefit is
> denied, and he will have to go through a lawyer to appeal it.  If the appeal
> process through the court does not approve his application, that is when
> he may venture out to look for a job.

(215).  Further in that regard, on March 31, 2005, Yu wrote:

> Even when he is completely out of depression, his past work experience is
> interfering with his motivation to seek a job.  According to him, at one job,
> because he was angry at the other person, he gave him [an] obscene
> gesture and this caused the other person [to become] angry and he was
> hit by the other person.  All these experience [sic] is really making him
> apprehensive about applying for any kind of job.

(215).

On March 29, 2005, Lucas noted that Provigil was effective in combating

Plaintiff's sleepiness, but that he was "unmotivated to take the Provigil as he feels

'bored' staying awake." (209).  Similarly, on April 19, 2005, Yu wrote that Plaintiff was

not taking his Provigil regularly as prescribed. (210).  However, on May 10, 2005,

Plaintiff reported taking Provigil most, though not all of the time, and that his motivation

and energy were slightly improved. (211).  Nevertheless, on September 29, 2005,

Plaintiff reported that he had stopped taking Provigil altogether, because he did not feel much of difference from the medication, and because his wife's insurance had stopped covering the prescription. (213).

On June 30, 2005, Yu reported that Plaintiff was feeling "much better."  Yu further wrote: "Overall there has been improvement in his depression.  However, it is not sufficient for him to go back to his old job.  However, if his depression is under better control, he can be referred to VESID so that he can look for another job opportunity by getting some kind of education." (212).  On September 29, 2005, Yu wrote: "Even though his mood fluctuations have been under good control but [sic] he has achieved maximum benefit at this time.  Because of his past history of difficulty at employments he is not willing to seek any kind of job." (213).  On December 27, 2005, Yu described Plaintiff as follows:

> He continues to feel very severely sleepy during the daytime and he does not have much energy or ambition.  It is highly possible that medication therapy alone may not be enough for him to come out of the depression completely.  There is strong possibility that he has unconscious wish to continue to be depressed, because he is afraid to go back to any kind of work situation which made him extremely difficult to handle. [sic]

(214).

On February 23, 2006, Yu reported that Plaintiff

> held a job . . . for 12 years, but at the job, he was in physical altercation, pushing and shoving with another employee and both of them were fired. Mark still has nightmares of that scene.  After then, he held [other jobs], but the longest was 6 months and all the jobs were ended by him being fired.  It is quite possible that he is afraid to go back to work, and he may qualify for PTSD.

(214).  On May 18, 2006, Yu stated that Plaintiff was taking Symbyax and Wellbutrin, which were keeping his depression under "marginal control." (390).  Yu reported that

9

Plaintiff's affect was constricted and that he claimed to feel hopeless at times. (*Id.*).  On

May 25, 2006, Yu opined that Plaintiff was suffering from impairments since 1991,

when he was fired from his job at Zotos, in Geneva, New York, which he had held for

twelve years. (335).  On June 6, 2006, Yu wrote:

> [H]is last job which he held longest was Zotos in 1991.  After 1991, there
> has not been any job which he held more than several months.  In 1996
> he worked at a gas company which lasted for 6 months, and that also
> ended due to his difficulty in getting along with other people.  From this
> history, it is very easily can be said [sic] that 1991 was when his real
> problem started.  This will be put down and this will be sent to [Plaintiff's
> attorneys].

(391).

On June 5, 2007, Yu completed another assessment, stating that Plaintiff had a

fair ability to do the following: carry out simple instructions, respond appropriately to

supervision, respond to co-workers, function independently, exercise appropriate

judgment, maintain social functioning, make simple decisions, and abide by occupation

rules.  Yu indicated that Plaintiff had a poor ability to do the following: remember work

procedures, remember detailed instructions, complete a normal workday on a sustained

basis, concentrate over an 8-hour workday, deal with stress. (400-402).  Yu further

indicated that Plaintiff's condition was likely to deteriorate under job stress, and that his

symptoms had been consistent and continuing since June 15, 2000. (*Id.*).

## STANDARDS OF LAW

_____42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the

Commissioner of Social security as to any fact, if supported by substantial evidence,

shall be conclusive."  The issue to be determined by this Court is whether the

Commissioner's conclusions "are supported by substantial evidence in the record as a

whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).  At step five of the five-step analysis above, the Commissioner may carry her burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.")  However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the

Commissioner cannot rely upon the grids, and instead "must introduce the testimony of

a vocational expert (or other similar evidence) that jobs exist in the economy which

claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. §

416.969a(d).[4]

Under the regulations, a treating physician's opinion is entitled to controlling

weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and
> severity of your impairment(s) is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not inconsistent with
> the other substantial evidence in your case record, we will give it
> controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other

substantial evidence in the record conflicts with the treating physician's opinion . . .  that

opinion will not be deemed controlling.   And the less consistent that opinion is with the

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states

---

[3]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[4]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a).  The regulation further states, in pertinent part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions

13

due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had not engaged in substantial gainful employment "at any time relevant to this decision." (14).  At the second step of the analysis, the ALJ found that plaintiff had the following severe impairment: bipolar disorder. (*Id.*).  At the third step of the sequential analysis, the ALJ found that plaintiff's "severe impairment" did not meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (13-14).

At the fourth step of the analysis, the ALJ made the following RFC determination: "[T]he claimant has the residual functional capacity to perform work at all exertional levels that required [sic] only performing simple, routine, 1 or 2 step tasks; only occasional contact with the public and co-workers; and only occasional changes in the work setting." (15).  In making this RFC determination, the ALJ found that Plaintiff's impairment could reasonably produce his alleged symptoms, but that his statements regarding the intensity, duration, and limiting effects of his symptoms were "only partially credible." (16).  For example, the ALJ noted that prior to Plaintiff's date last insured, his medical notes indicated that his depression was "well controlled on Serzone," and that "[p]rior to the [date last insured], the claimant had few significant emotionally based limitations or complaints." (*Id.*).  Regarding Yu's medical opinions for the period after the date last insured, the ALJ found them "somewhat inconsistent." (17).  For example, the

14

ALJ reviewed Yu's office notes during the period leading up to December 2004, which generally indicate that the plaintiff's mood was stable, and found "no support" for Yu's opinion rendered on December 21, 2004, which indicated that Plaintiff had "no useful ability to function in numerous areas." (*Id.*).  Based on her residual functional capacity finding, the ALJ concluded that Plaintiff could perform his past relevant work as an industrial cleaner. (*Id.*).  Alternatively, based on testimony from a vocational expert ("VE"), the ALJ found that prior to his date last insured, Plaintiff could also perform the jobs of cleaner, kitchen helper, and office helper. (17-18).

ANALYSIS

In this action, Plaintiff, who claims to have become completely disabled in June 2000, contends that the ALJ erred in several respects.  First, he  contends that the ALJ failed to correctly determine the onset date of his "disability," as required by the Commissioner's rules, SSR 83-20.  However, the Court disagrees, and finds that SSR 83-20 is not applicable in this case, since the ALJ did not find that Plaintiff was disabled at any time. *See, Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997) (Agreeing that SSR 83-20 "applies only when there has been a finding of disability."); *accord, Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) ("The ALJ did not find that Scheck was disabled, and therefore, there was no need to find an onset date.  In short, SSR 83-20 does not apply."); *Baladi v. Barnhart*, 33 Fed. Appx. 562 (2d Cir. 2002) (unpublished) ("[T]he ALJ's determination that plaintiff was not disabled obviated the duty under SSR 83-20 to determine an onset date.").

Plaintiff also contends that the ALJ's residual functional capacity assessment was

15

erroneous.  Specifically, he alleges that the ALJ erred by rejecting Dr. Yu's opinions, that

Plaintiff had "no useful ability to function in eleven separate areas of intellectual

functioning including the inability to maintain attention and concentration, follow work

rules, and deal with work stresses," on the grounds that they were inconsistent with

other evidence.  According to Plaintiff, the ALJ selectively chose to focus on portions of

Yu's opinions that were unfavorable to him.  Plaintiff further indicates that Yu's opinions

are of "critical importance," since they indicate that Plaintiff has suffered from his alleged

limitations since 1991.  The Court notes that Yu also indicated that Plaintiff's limitations

were consistent and continuing since June 15, 2000. (402).  In any event, the Court

disagrees with Plaintiff's argument.  At the outset, it is important to recall that Yu did not

begin treating Plaintiff until April 2004, which was approximately sixteen months after

Plaintiff's date last insured.  Despite that, Yu does not explain his basis for claiming that

Plaintiff's symptoms have been consistent and continuing since June 15, 2000, except to

say that is when Plaintiff stopped working. (See, 391, 400-402).  However, it does not

appear that Plaintiff actually stopped working in 2000 in any event, since in October

2003, he stated that he was working managing "his" rental properties. (See, 99) (see

also,102, where Plaintiff described his sources of income as "rental income and wife's

work").  Moreover, the only limitations identified in Yu's report dated April 22, 2004 relate

to sustaining concentration and routine, and dealing with co-workers and the public.

(170).  On the other hand, Ghosn's opinions, issued much closer in time to the relevant

cutoff date of December 31, 2002, consistently indicate that Plaintiff's depression was

well-controlled with Serzone.  Plaintiff contends that Yu's "onset opinion is entitled to

controlling weight because there is no medical evidence to contradict it." However, as

16

just mentioned, the opinions of Ghosn, Plaintiff's treating physician, appear to do just that.  Having reviewed the entire record, the Court finds that the ALJ's residual functional capacity assessment is supported by substantial evidence.  Similarly, the ALJ's credibility assessment is also supported by substantial evidence.

Next, Plaintiff contends that the ALJ erred by finding that Plaintiff could perform his past relevant work as an industrial cleaner, since she "failed to make any findings as to the requirements of that position other than that it was medium in exertional demands and unskilled." (Pl. Memo of Law at 13).  Additionally, Plaintiff alleges that the hypothetical question which the ALJ posed to the VE concerning past relevant work was inadequate, both because it did not include all of Plaintiff's mental limitations, and because portions of the transcript of her question are blank, due to the tape recording of the hearing being inaudible. (429).  Plaintiff further alleges that the job numbers provided by the VE, upon which the ALJ relied to make her alternative finding at step five, do not constitute substantial evidence.  Specifically, in that regard, Plaintiff contends that, although the VE "purported to identify the number of these jobs both regionally and nationally," "the job numbers he cited included other job titles which he did not identify" or quantify. (Pl. Memo of Law at 17).

The Court agrees that a remand is necessary, both to clarify the non-exertional requirements of Plaintiff's past work, as well as to clarify the VE's testimony regarding the type and number of jobs that Plaintiff allegedly can perform.  At the same time, the ALJ should develop the record to determine whether, and to what extent, Plaintiff was engaged in substantial gainful activity, by managing or otherwise overseeing rental properties, during the relevant period.

17

CONCLUSION

For the reasons discussed above, defendant's application [# 4] is denied,

plaintiff's application [#5] is granted, and pursuant to 42 U.S.C. § 405(g), sentence four,

this matter is remanded for further administrative proceedings consistent with this

Decision and Order.

So Ordered.

Dated: Rochester, New York
April 17, 2008

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge